AUSAs: Jorja Knauer, David A. Markewitz

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | 7:25 mj 1186 |
| UNITED STATES OF AMERICA<br><br>                 v.<br><br>NOSSON SKLAR,<br>     a/k/a "Nathan Sklar,"<br><br>                 Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1028A, 1035, 1343, 1347, and 2<br><br>COUNTIES OF OFFENSE:<br>ROCKLAND & NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

     NICHOLAS ANTA, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), and charges as follows:

### COUNT ONE
### (Health Care Fraud)

     1.     From at least in or about January 2020 through at least in or about July 2024, in the Southern District of New York and elsewhere, NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, to wit, SKLAR participated in a scheme to make or cause others to make materially false statements to health care benefit programs concerning the identity of the provider rendering medical services in claims for payment for the provision of those services.

(Title 18, United States Code, Sections 1347 and 2.)

### COUNT TWO
### (Wire Fraud)

     2.     From at least in or about January 2020 through at least in or about July 2024, in the Southern District of New York and elsewhere, NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, SKLAR engaged in a scheme to make or cause others to make materially false statements to health care benefit programs concerning the identity of the provider rendering medical services in claims for payment for the provision of those services, and sent and received, and caused others to send and receive, emails

and other electronic communications and wires, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (False Statements Relating to Health Care Matters)

3. From at least in or about January 2020 through at least in or about July 2024, in the Southern District of New York and elsewhere, NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, in matters involving health care benefit programs, and in connection with the delivery of and payment for health care benefits, items, and services, willfully and knowingly falsified, concealed, and covered up by trick, scheme, and device, material facts, and made materially false, fictitious, and fraudulent statements and representations, and made and used materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, to wit, SKLAR made and caused others to make materially false statements to health care benefit programs concerning the identity of the provider rendering medical services in claims for payment for the provision of those services.

(Title 18, United States Code, Sections 1035 and 2.)

## COUNT FOUR
### (Aggravated Identity Theft)

4. From at least in or about January 2020 through at least in or about August 2024, in the Southern District of New York and elsewhere, NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SKLAR used and caused others to use the actual name, National Provider Identifier number, and medical license number of a physician ("Victim-1"), without lawful authority, to contract with various health care benefit programs and submit medical bills falsely identifying Victim-1 as the rendering provider, during and in relation to the health care fraud and wire fraud schemes charged in Counts One and Two of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1) & (b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I am a Special Agent with HHS-OIG, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my training and experience, my conversations with other law enforcement officers and others, including about search warrant returns, and my examination of correspondence, health care benefit claims data, and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during my investigation. Where the contents of documents or recordings and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. This Complaint relates to NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, who submitted or caused others to submit millions of dollars in claims to various health care benefit programs for medical services, asserting that the services were rendered by Victim-1, a physician with whom SKLAR is acquainted. But that was false. Victim-1 did not provide those services, and did not authorize SKLAR to use his identity. And when confronted about his conduct, SKLAR later admitted to Victim-1 that he had committed a "fraud" by billing under Victim-1's name, and that he did it for the money.

*Background on Medicare & Private Health Care Benefit Programs*

7. At all times relevant to this Complaint, the Medicare Program ("Medicare") was a federal health care program providing benefits to persons who are, among other things, over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

8. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

9. Medicare was subdivided into multiple Parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B was a medical insurance program that covered, among other things, certain physician services, outpatient services, and other services, including face-to-face office visits. Medicare Part C, commonly referred to as "Medicare Advantage," provided beneficiaries with many of the services provided under Parts A and B, in addition to mandatory supplemental benefits and optional supplemental benefits.

10. Part C beneficiaries enrolled in a managed care plan administered by private health insurance companies or health maintenance organizations. Numerous entities were contracted by CMS to provide managed care to Part C beneficiaries through various approved plans. Among the various responsibilities born by Medicare Advantage plans were the requirements that those plans receive, adjudicate and pay the claims of authorized providers seeking reimbursement for the cost of health care benefits, items, or services provided to Medicare Part C beneficiaries.

11. Physicians who performed medical services in connection with a Medicare program applied for and were given a unique "number," referred to as a National Provider Identifier ("NPI") number. That NPI number allowed the physician to submit bills, commonly referred to "claims," for payment to Medicare, including through Medicare Advantage plans, to seek reimbursement for medical services that they had provided to Medicare Part C beneficiaries.

12. To receive payment from Medicare through Medicare Advantage plans, a physician was required to submit a health insurance claim form, known as Form HCFA-1500, through which the physician certified that the claims were true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The physician also certified that the services being billed were medically necessary and were in fact provided as billed. Medicare Advantage Plans often permit physicians to submit these claims either electronically or in hard copy claims forms. Each claim form required certain important

information, including, among other data, (i) the provider's NPI number, (ii) the name and identification number of the physician who ordered the item or service, (iii) the date of service, and (iv) the health care products, items, or services supplied to the beneficiary.

13. Under Medicare Advantage regulations, Medicare Part C would pay for the cost of services that participant physicians provided to the beneficiary. For a Medicare Advantage plan to pay for physician services, the service must be medically necessary and performed.

14. In addition to Medicare Advantage, many private health insurance companies also offered private insurance plans, not affiliated with Medicare, affecting commerce, under which medical benefits, items, and services were provided to individuals. Those private benefit programs are also health care benefit programs as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

*Relevant People & Entities*

15. I have learned, in substance and in part, the following about NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant:

   a. According to New York State Department of Motor Vehicle records, SKLAR lives at an address in the Southern District of New York.

   b. I believe that SKLAR is the owner of a particular email account (the "Sklar Email Account"). That conclusion is based on a review of information and emails seized from that account pursuant to a search warrant. Moreover, according to New York State Department of Motor Vehicle records, the Sklar Email Account is listed in a 2023 Vehicle Registration/Title Application that was submitted under and signed in SKLAR's name. Based on a review of public information provided by the Sklar Email Account's service provider, I know that none of the data centers servicing the Sklar Email Account are located in New York State.

   c. I also believe that SKLAR is the user of a cellphone number ending in x2344 (the "Sklar Number"). Not only is a "Nathan Sklar" listed as that number's subscriber according to the cellular carrier's records, but that number is connected to the Sklar Email Account.

16. I have learned, in substance and in part, the following about Victim-1:

   a. Based on discussions with Victim-1, and a review of public information and information seized from the Sklar Email Account, I have learned that Victim-1 is a physician practicing in the vicinity of Rockland County, New York, and that Victim-1 has known SKLAR for many years.

17. I have learned, in substance and in part, the following about the "Rehabilitation Company":

   a. According to bank records for bank accounts ending in x8958 and x9359, the Rehabilitation Company was incorporated in or about November 2022, with its main

offices located at an address in the vicinity of Grand Street, New York, NY (the "Grand Street Address"). According to account opening documents, NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, is the chief executive officer of the company and its 100% owner.

      b.      According to CMS records, the Rehabilitation Company operates a series of physical rehabilitation facilities in the vicinity of New York City, including one in the vicinity of Rockaway Avenue, Brooklyn, NY.

      c.      An IRS Form SS-4 seized from the Sklar Email Account lists an employer identification number for the Rehabilitation Company that ends in x6050 (the "Rehabilitation Company's EIN").

18.      I have learned, in substance and in part, the following about the "Medical Spa":

      a.      Records maintained by the New York Department of State, Division of Corporations indicate that the Medical Spa was incorporated on or about February 8, 2023. Currently, the registered agent on file for the company is "Nathan R Sklar."

      b.      I believe that the Medical Spa operates (or purports to operate) various "MedSpa" facilities in the vicinity of New York City.[1] For instance, emails seized from the Sklar Email Account refer to the Medical Spa as a "MedSpa," and another record seized from that account identifies the entity as a medical aesthetics business that is "non-MD owned with MD/DO/NP Medical Director." Similarly, the Medical Spa's public website identifies the company as operating various studios that offer "non-invasive treatments" that aim "to harmonize wellness and beauty." That same website lists two locations for the Medical Spa, both in Manhattan.

      c.      Although records seized from the Sklar Email Account reflect that SKLAR is involved in the management and operation of the Medical Spa, another individual is listed as the business's owner on, among other documents, bank account opening paperwork.

19.      I have learned, in substance and in part, the following about the "Device Manufacturer":

      a.      The Device Manufacturer and its related entities sell an FDA-approved medical device (the "Device") that is attached to a patient's shoes to reduce chronic knee pain.

      b.      In or about June 2020, the Device Manufacturer contracted with the Rehabilitation Company or one of its affiliated entities, for the Rehabilitation Company to purchase various Devices on consignment, with the expectation that the Rehabilitation Company would then sell those Devices to its patients/customers.

---

[1] A MedSpa is a spa-like facility that provides non-surgical medical procedures under the general supervision of a board-certified physician.

20.     Health Plan-1 is a health care benefit program as defined in Title 18, United States Code, Section 24(b), which provides both private health care insurance services and Medicare Advantage services.

21.     Health Plan-2 is a health care benefit program as defined in Title 18, United States Code, Section 24(b), which provides both private health care insurance services and Medicare Advantage services.

22.     Health Plan-3 is a health care benefit program as defined in Title 18, United States Code, Section 24(b), which provides both private health care insurance services and Medicare Advantage services.

*Contracting with Health Care Benefit Programs in Victim-1's Name*

23.     From at least in or about 2020 through at least in or about 2021, various contracts were executed between different health care benefit programs and someone purporting to be Victim-1 that contemplated that "Victim-1," in Victim-1's capacity as a physician, would begin providing the Devices to the insurance plans' members. For example:

   a.    In or about October 2020, a contract was executed between Health Plan-1 and someone purporting to be Victim-1 (the "Health Plan-1 Contract"), which purported to amend a pre-existing contract between "Victim-1" and Health Plan-1 that had made "Victim-1" part of Health Plan-1's provider network. According to the Health Plan-1 Contract, "Victim-1" would now be permitted to prescribe the Device to certain Health Plan-1 members. "Victim-1" was identified in the contract by name, and a signature represented to belong to Victim-1 was affixed to the contract.

   b.    In or about, June 2021, a similar contract was executed between Health Plan-2 and someone purporting to be Victim-1 (the "Health Plan-2 Contract"), which purported to be an amendment to a pre-existing contract between "Victim-1" and Health Plan-2 that had made "Victim-1" part of Insurance Plan-2's provider network. According to the Health Plan-2 Contract, "Victim-1" would now be permitted to provide the Device to certain Health Plan-2 plan members. Victim-1 was identified in the contract by both name and NPI number.[2]  A signature for "Victim-1" that resembles the signature affixed to the Health Plan-1 Contract was also affixed to this contract.

24.     Both Health Plan-1 and Health Plan-2 appear to have entered those contracts with the understanding that "Victim-1" was providing services in connection with or at facilities managed by the Rehabilitation Company.

   a.    With respect to the Health Plan-1 Contract, I have reviewed a separate "Participating Provider Owner/Manager Disclosure Certification" seized from the Sklar Email Account that purports to have been filed by "Victim-1" in connection with "Victim-1's" underlying application to join Health Plan-1's provider network. In that certification, in which Victim-1 is identified by name, Victim-1's place of business is listed as being the

---

[2] I have confirmed that the NPI listed in the contract is Victim-1's real NPI by searching that NPI in a publicly accessible database maintained by the U.S. Centers for Medicare & Medicaid.

6

Grand Street Address—*i.e.*, the location of the Rehabilitation Company's primary office. In addition, the underlying participating provider agreement submitted in Victim-1's name listed Victim-1's federal tax ID number as being the same as the Rehabilitation Company's EIN.

  b.  Likewise, the Health Plan-2 Contract listed Victim-1's tax ID number as the Rehabilitation Company's EIN and Victim-1's business address as the Grand Street Address.

25.  In or about July 2024, Victim-1 reported to law enforcement, in substance and in part, the following:

  a.  Victim-1 claimed to have recently learned about the Health Plan-2 Contract, and that the contract had been signed without Victim-1's permission or consent.

  b.  Victim-1 stated that Victim-1 has known NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, for many years and that Victim-1 and SKLAR had previously spoken about potentially pursuing business opportunities together. Victim-1 stated that those business plans never materialized, however, and that Victim-1 expressly and repeatedly told SKLAR, including over email, that SKLAR did not have Victim-1's consent to use Victim-1's name or information in connection with any business ventures.

  c.  Consistent with Victim-1's statements, I have reviewed emails seized from the Sklar Email Account that show that Victim-1 repeatedly told SKLAR not to conduct business in Victim-1's name.

26.  The signatures purporting to belong to Victim-1's that are affixed to the Health Plan-1 and Health Plan-2 Contracts appear to be illegitimate on their face.

  a.  To start, the signatures on the Health Plan-1 and Health Plan-2 Contracts do not resemble a version of Victim-1's actual signature that I have reviewed.[3]

  b.  Moreover, all three of those signatures are also different from another signature purportedly belonging to Victim-1 that was included in another document submitted to Health Plan-1.

27.  Moreover, it appears that NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, or someone working with him, represented to the Device Manufacturer that an address associated with SKLAR was Victim-1's mailing address.

  a.  Based on a review of the Sklar Email Account, I know that in or about September 2023, the Device Manufacturer sent a letter to an entity affiliated with the Rehabilitation Company. The letter indicates that a copy would also be delivered to Victim-1 at two addresses, one of which was an address for a Rehabilitation Company facility, and

---

[3] I have reviewed a copy of an affidavit that Victim-1 sent to the Sklar Email Address, which bears Victim-1's signature.

the other of which was a particular apartment unit in the vicinity of East Broadway, New York, NY (the "Apartment").

      b.      Based on bank records that I have reviewed for a bank account ending in x9532, I have learned that this account belongs to SKLAR and lists SKLAR's address as the Apartment. Moreover, through discussions with Victim-1, I know that Victim-1 does not live in New York City, and did not live in New York City when this letter was sent.

<i>The Recorded Conversations</i>

28.    On or about July 25, 2024, Victim-1 spoke on the phone with NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, at the Sklar Number. Based on a review of a recording of that call, I know that SKLAR (NS) and Victim-1 (V1) stated, in part, the following[4]:

| | |
|---|---|
| V1: | Why would you have said that I'm an owner or a manager of something I don't own or manage? |
| NS: | Because . . . when we did the [Device contract], right . . . I just needed a medical director. That's all. . . . [Y]ou had no day-to-day operations of it. I, I'm, I'm keeping you hold harmless. I'm covering everything. |
| . . . . | |
| V1: | Alright. So how long have you been billing in my name, Nathan? Tell me the truth. |
| NS: | Probably a year. |
| . . . . | |
| V1: | . . . Nathan . . . what right do you have billing under me saying that you represent me? Why would you have been doing this? I don't understand. |
| NS: | I was wrong. I was wrong. |
| . . . . | |
| V1: | . . . [W]hy would you act fraudulently in my name and sign my name? And why would you enter into contracts? And why would you tell insurance companies that you're billing under me? I, this is a, this is fraud. Just tell me why, how and why you would do that? |
| NS: | I had no other, I had, I don't know. . . . |
| . . . . | |
| V1: | It's fraud, right? Do you agree that it's fraud? |
| NS: | Yes. |

---

[4] What follows is a draft transcription of portions of the call, which is non-final and subject to change.

|  |  |  |
|---|---|---|
|  | . . . . |  |
|  | V1: | How long have you been doing this? . . . . When was the first time? 'cause I have suspicions. I, I remember sending you emails years ago, suspicious that you were representing me. . . . Give me a guesstimate. Give me a guesstimate. |
|  | . . . . |  |
|  | NS: | Two years. Two years. |
|  | . . . . |  |
|  | V1: | Can I ask you one more important question? . . . . [W]hy would you do this? Is it just the money? Why would you do this? |
|  | NS: | Because it was the money. Because, because it was the money. That's all. |

29.  On or about July 31, 2024, Victim-1 met in person with NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, at Victim-1's home. Based on a review of a video recording of that meeting, I know that SKLAR made many similar admissions to Victim-1, including indicating that Victim-1 had "nothing" to do with the Device or claims submitted to health benefit programs for the Device. And in response to a question by Victim-1 about "who's been billing" in Victim-1's name, SKLAR responded that "[it] was a guy in Pakistan." Below is a screenshot of SKLAR taken from the recording.



*The Amount of Fraudulent Billing*

30.  I have reviewed billing records produced by Health Plan-1, Health Plan-2, and Health Plan-3. Based on those records, I have learned that the following approximate amounts were billed listing Victim-1 as the rendering provider and under the Rehabilitation Company's EIN.

    a.  Between in or about January 2020 and in or about July 2024, more than $23 million in claims were submitted to Health Plan-1 under Victim-1's name, claiming

9

that Victim-1 rendered services to a Health Plan-1 member under the Rehabilitation Company's EIN. More than $11 million of those claims were actually paid. Based on a review of the service codes, I know that a large quantity of these claims was related to the Device. Specifically, approximately $11.14 million of the billed amount, and approximately $8.808 million of the paid amount, were coded as relating to the Device.

        b.        Between in or about November 2021 and in or about March 2024, more than $1.5 million in claims were submitted to Health Plan-2 under Victim-1's name, claiming that Victim-1 rendered services to a Health Plan-2 member under the Rehabilitation Company's EIN. More than $1.4 million of those claims were actually paid. Based on a review of the service codes, I know that a large quantity of these claims was related to the Device. Specifically, approximately $1.48 million of the billed amount, and approximately $1.46 million of the paid amount, were coded as relating to the Device.

        c.        Between in or about January 2020 and in or about July 2024, more than $188,000 in claims were submitted to Health Plan-3 under Victim-1's name, claiming that Victim-1 rendered services to a Health Plan-3 member under the Rehabilitation Company's EIN. More than $39,000 of those claims were actually paid.

31.    Moreover, I have reviewed records maintained by the U.S. Department of Homeland Security ("DHS") tracking the international trips taken by Victim-1. Comparing those travel records to the billing records described above, I have learned that numerous Rehabilitation Company bills were submitted listing Victim-1 as having rendered care at one of the Rehabilitation Company's New York State-based facilities during periods when, based on DHS travel records, it appears that Victim-1 was outside the United States.

32.    Based on Victim-1's statements and travel records, emails seized from the Sklar Email Account, and the recordings of meetings between Victim-1 and NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, I submit that there is probable cause to conclude that none of the billing described above is legitimate. Specifically, although the submitted claims assert that Victim-1 was the rendering provider, there is probable cause to believe that Victim-1 was not associated with the care, if any, that these beneficiaries received, and that Victim-1 did not authorize SKLAR or the Rehabilitation Company to submit these claims in Victim-1's name or under Victim-1's NPI.

### *Use of Victim-1's Name in Connection with the Medical Spa*

33.    Similar to the Rehabilitation Company, I submit that there is probable cause to believe that NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, also used Victim-1's name and likeness, without Victim-1's consent, in connection with the Medical Spa.

34.    Based on information provided by Victim-1, I understand that Victim-1 and NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, previously discussed potentially opening a MedSpa at which Victim-1 would be the supervising physician. According to Victim-1, however, the two never actually opened a MedSpa together. Nevertheless, it appears that Victim-1's information has been used in connection with the Medical Spa.

35.     For example, based on a review of emails seized from the Sklar Email Account pursuant to a search warrant, I have learned, in substance and in part, the following:

a.      On or about March 17, 2023, the person listed on paper as the Medical Spa's owner submitted an application to work with a company that assists customers with paying for out-of-pocket medical expenses on credit. SKLAR was copied on the submission email. The application identified Victim-1 by name and medical license number as the physician on staff with the Medical Spa. In addition, the application was accompanied by a contract that was supposedly entered into between the Medical Spa and Victim-1, which purported to establish Victim-1 as the "supervising physician" for the business. That contract bears a signature for Victim-1 that appears to resemble the signature on the Health Plan-1 Contract and the Health Plan-2 Contract, which, as noted above, does not resemble a legitimate copy of Victim-1's signature that I have reviewed.

b.      On or about March 24, 2023, a Medical Spa employee emailed what appear to be various consultants, copying SKLAR, a presentation deck that appears either to advertise or propose establishing a partnership between the Medical Spa and a high-end hotel located at an address in the vicinity of Madison Avenue, New York, NY (the "Hotel"). In that presentation deck, Victim-1 is identified as the Medical Spa's "Medical Director." Although the Medical Spa is not currently listed on the Hotel's public website, the Medical Spa's own website lists the Hotel's address as one of the business's location.

c.      On or about July 21, 2023, a person affiliated with the Medical Spa emailed a "customer applicant" to a pharmaceutical distributor and medical supply wholesaler, copying SKLAR. That application listed Victim-1 as the physician associated with the Medical Spa, and identified Victim-1 by, among other things, name and medical license number.

36.     In addition to the foregoing, the publicly available website for the Medical Spa appears to use a fake photograph of Victim-1.

a.      The Medical Spa's website lists Victim-1's name and credentials under a section titled "Meet Our Doctors." Moreover, the website includes the below photograph (the "Photograph"), which, according to the website, is of Victim-1.



b.      I have met Victim-1 and know that he is both a different race than the man in the Photograph and a different age. Moreover, I have performed a reverse image search of the Photograph on Google and believe that the Photograph is a stock photograph—that is, a photograph licensed for commercial or creative use and that is available for purchase

11

or use under specific terms. Specifically, the below image is available on the website "freepik.com," and is titled, "Portrait of successful male doctor Hispanic smiling and looking at camera doctor in medical gown."[5]



WHEREFORE, I respectfully request that a warrant be issued for the arrest of NOSSON SKLAR, a/k/a "Nathan Sklar," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Nicholas Anta (signed by VR with permission)
NICHOLAS ANTA
Special Agent
U.S. Department of Health and Human Services,
Office of the Inspector General

Sworn to me through the transmission of
this Complaint by reliable electronic
means (video call), this 10th day of April, 2025.

THE HONORABLE VICTORIA REZNIK
United States Magistrate Judge
Southern District of New York

---

[5] *See* https://www.freepik.com/premium-photo/portrait-successful-male-doctor-hispanic-smiling-looking-camera-doctor-medical-gown_32193296.htm (last visited on or about April 10, 2025).